1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

7

8   MARSHALL BURGESS, JR.,                    )          3:12-cv-00085-LRH-WGC
                                              )
            Plaintiff,                        )          **REPORT AND RECOMMENDATION**
9                                             )          **OF U.S. MAGISTRATE JUDGE**
            vs.                               )
10                                            )
    BRIAN. E. SANDAVAL, et. al.               )
11                                            )
                                              )
12          Defendants.                       )
                                              )
13   _____ )

14          This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior

15   United States District Judge. The action was referred to the undersigned Magistrate Judge

16   pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the

17   court is Plaintiff's Motion for Summary Judgment. (Doc. # 96.)[1] Defendants have opposed the

18   motion (Doc. # 105) and Plaintiff filed a reply (Doc. # 118). Defendants also filed an errata to

19   their motion. (Doc. # 119.)

20          Also before the court is Defendants' Motion for Summary Judgment. (Doc. # 109.)

21   Plaintiff opposed (Doc. # 114) and Defendants filed a reply (Doc. # 120) and errata to their

22   reply (Doc. # 120).[2]

23          After a thorough review, the court recommends that Plaintiff's motion be denied, and

24   that Defendants' motion be granted in part and denied in part.

25   ///

26   _____

27          [1] Refers to court's docket number.

28          [2] Docs. # 105 and # 109 are identical but were docketed separately by the Clerk's Office. Additionally, Docs. # 119 and # 120 are identical.

# I. BACKGROUND

At all relevant times, Plaintiff Marshall Burgess was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Third Am. Compl., Doc. # 65 at 1.) The events giving rise to this action took place while Plaintiff was housed at Warm Springs Correctional Center (WSCC). (*Id*.) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id*.) Defendants are Raul Betancourt, Cynthia Greene, Melissa Haynes, James Kelly, Sean Moore, Richard Payne, Michael Peabody, Bobby Preston, Tim Robinson and Darrel Taylor. (*Id*. at 2-4.)

**A. Third Amended (Operative) Complaint**

The court granted Plaintiff's unopposed motion for leave to amend, and this action is proceeding on the Third Amended Complaint. (*See* Mtn. for Leave to Amend, Doc. # 58; Minutes where motion was granted, Doc. # 64; Third Am. Compl., Doc. # 65.)

Count I is asserted against defendants Kelly, Peabody, Moore, Payne, Robinson, Taylor, and Preston, and alleges violations of his Eighth and Fourteenth Amendment rights. (Doc. # 65 at 6-9.) First, Plaintiff asserts a failure to protect claim based on the allegation that he was attacked by other inmates and defendant Betancourt failed to intervene. (*Id*. at 6.) Second, he asserts that defendants Robinson and Preston were involved in an excessive force incident after the attack by the inmates. (*Id*. at 7.) He contends that defendant Robinson ordered him to get on the floor onto his stomach, but Plaintiff was unable to move fast due to injuries he had suffered from the previous attack. (*Id*.) He claims that the officers used hands on force and placed leg cuffs on Plaintiff and took him to the unit office. (*Id*.)

Third, Plaintiff alleges another incident of excessive force involving defendants Peabody, Moore, Payne, Robinson, Taylor, Kelly and Preston. Plaintiff contends that he was dragged down a hallway, slammed against a wall and then the floor, resulting in his left hand being broken, and was then tasered unnecessarily. (*Id*. at 6-8.) He claims that he reported swelling and burning in his hand, but the nurses denied him treatment, when an x-ray taken a few days later revealed his hand was broken. (*Id*. at 9.) Finally, he alleges a Fourteenth Amendment due process violation because he asserts that defendant Kelly wrote up a false incident report and

1  notice of charges to cover up these Eighth Amendment violations, stating that Plaintiff had

2  assaulted the officers. (*Id.* at 9.) He contends there was no evidence to support the charges.

3  (*Id.*)

4       Count II is directed to defendants Greene and Haynes. (Doc. # 65 at 10.) Plaintiff alleges

5  that nurses Greene and Haynes were the nurses who denied Plaintiff treatment when he

6  complained that his hand was injured in connection with the incident described in Count I, and

7  was later found to be broken. (*Id.*) He asserts that this constitutes deliberate indifference to a

8  serious medical need in violation of the Eighth Amendment. (*Id.*)

9  **D. Plaintiff's Motion for Summary Judgment**

10       Plaintiff moves for summary judgment as to the failure to protect and excessive force

11  claims alleged against defendants Betancourt, Kelly, Moore, Payne, Peabody, Preston,

12  Robinson, and Taylor and the Eighth Amendment deliberate indifference to a serious medical

13  need claim against defendants Greene and Haynes. (Doc. # 96.)

14  **E. Defendants' Motion for Summary Judgment**

15       Defendants move for summary judgment, arguing that the officers did not fail to protect

16  Plaintiff and did not use excessive force. (Docs. # 105, # 109.) They further argue that

17  defendant nurses Greene and Haynes were not deliberately indifferent to a serious medical

18  need. (*Id.*)

19       While they maintain they are entitled to summary judgment, they contend that at a

20  minimum, factual issues exist which preclude the entry of summary judgment in Plaintiff's

21  favor. (*Id.*)

22                      **II. LEGAL STANDARD**

23       "The purpose of summary judgment is to avoid unnecessary trials when there is no

24  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,

25  18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted). All reasonable inferences are drawn in

26  favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008) (citing

27  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate

28

1  if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

2  there is no genuine issue as to any material fact and that the movant is entitled to judgment as

3  a matter of law." *Id.* (quoting Fed.R.Civ.P. 56(c)).[1] Where reasonable minds could differ on the

4  material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S.

5  at 250.

6        The moving party bears the burden of informing the court of the basis for its motion,

7  together with evidence demonstrating the absence of any genuine issue of material fact.

8  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence

9  in an inadmissible form, only evidence which might be admissible at trial may be considered

10 by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

11       In evaluating the appropriateness of summary judgment, three steps are necessary:

12 (1) determining whether a fact is material; (2) determining whether there is a genuine issue for

13 the trier of fact, as determined by the documents submitted to the court; and (3) considering

14 that evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250.

15 As to materiality, only disputes over facts that might affect the outcome of the suit under the

16 governing law will properly preclude the entry of summary judgment; factual disputes which

17 are irrelevant or unnecessary will not be considered. *Id.* at 248.

18       In determining summary judgment, a court applies a burden shifting analysis. "When

19 the party moving for summary judgment would bear the burden of proof at trial, 'it must come

20 forward with evidence which would entitle it to a directed verdict if the evidence went

21 uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of

22 establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R.*

23 *Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.  2000) (internal

24 citations omitted). In contrast, when the nonmoving party bears the burden of proving the

25

26 [1]Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary judgment if
the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled to judgment

27 as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.

28                                                              4

claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323-25. If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

### III. DISCUSSION

**A. Eighth Amendment Failure to Protect & Excessive Force**

**1. Legal Standard- Failure to Protect**

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)(quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

"[P]rison officials have a duty…to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citations and quotations omitted). "Having incarcerated

5

1   'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,'

2   having stripped them of virtually every means of self-protection and foreclosed their access to

3   outside aid, the government and its officials are not free to let the state of nature take its

4   course." *Id.* (internal citations omitted). "Being violently assaulted in prison is simply not 'part

5   of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (citing

6   *Rhodes*, 452 U.S. at 347).

7        To establish a violation of this duty, the prisoner must establish that prison officials were

8   "deliberately indifferent" to serious threats to the inmate's safety. *Farmer*, 511 U.S. at 834; *see*

9   *also Labatad v. Corrections Corp. of America*, 714F.3d 1155, 1160 (9th Cir. 2013) (citing

10  Gibson *v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). Under the deliberate

11  indifference standard, a violation of the Eighth Amendment is only found when an objective

12  and subjective component are met.  *See Farmer*, 511 U.S. at 834; *Labatad*,  714F.3d at 1160.

13       First, "the deprivation alleged must be, objectively, sufficiently serious…; a prison

14  official's act or omission must result in the denial of 'the minimal civilized measures of life's

15  necessities.'" *Farmer*, 511 U.S. at 834  (citations and quotations omitted).  When a plaintiff

16  claims prison official's failed to take reasonable steps to protect, the plaintiff must show that

17  "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citations

18  omitted).

19       Second, the inmate must satisfy the subjective element. This means that the prison

20  official must "know of and disregard an excessive risk to inmate health or safety; the official

21  must both be aware of facts from which the inference could be drawn that a substantial risk of

22  serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  "Mere

23  negligence is not sufficient to establish liability." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir.

24  1998). "Liability may only follow if a prison official 'knows that inmates face a substantial risk

25  of serious harm and disregard that risk by failing to take reasonable measures to abate it.'"

26  *Labatad*,714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847).

27       The Ninth Circuit has recognized that a plaintiff may predicate an Eighth Amendment

28

violation on failure to intervene. *See Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (citation omitted) ("a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene.")**.**

**2. Legal Standard- Excessive Force**

The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. It "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted). The "unnecessary and wanton infliction of pain...constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

"[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is...whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *see also Whitley*, 475 U.S. at 320-21; *Watts v. McKinney*, 394 F.3d 710, 711 (9th Cir. 2005); *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327).

In determining whether the use of force is excessive, courts are instructed to examine "the extent of the injury suffered by an inmate[;]" "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of the forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

An inmate need not establish serious injury; however, the lack of serious injury is relevant to the Eighth Amendment inquiry. *See Wilkins v. Gaddy*, 130 S.Ct. 1175, 1178 (2010). "The extent of injury may also provide some indication of the amount of force applied." *Id.*

That being said, not "every malevolent touch by a prison guard gives rise to a federal

cause of action...The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327); *see also Wilkins*, 130 S.Ct. 1178 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citing *Hudson*, 503 U.S. at 9)).  "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 130 S.Ct. at 1178-79.  If the nature of the injuries is more than *de minimis*, but still "relatively modest," the inmate's damages will likely be limited.  *See id*. at 1180.

Courts must be deferential when reviewing the necessity of using force. *See Whitley*, 475 U.S. at 321-22; *see also Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2009), *cert. denied*, 131 S.Ct. 1465 (Feb.  22, 2011) ("Prison officials are entitled to deference whether a prisoner challenges excessive force or conditions of confinement."  (citing *Whitley*, 475 U.S. at 322)).

The court again points out that the Ninth Circuit has recognized that a plaintiff may predicate an Eighth Amendment violation on failure to intervene. *See Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995) (citation omitted) ("a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene."); *see also Motley v. Parks*, 383 F.3d 1058, 1071 (9th Cir. 2004) (individual liability may be based either on participation or failing to intervene).

### 3. Plaintiff's Version of Events and Position

#### a. Failure to Protect-Defendant Betancourt

According to Plaintiff, on March 6, 2011, after dinner, he was called to cell 32 and the inmates in that room told him to "roll up," but he refused. (Doc. # 96 at 3 ¶ 1.) In response, one of the inmate's pushed Plaintiff into the cell and he was assaulted, battered and stabbed on top of the head with a nail. (*Id*., citing Ex. C.) The fight made its way onto the tier, and defendant

1  Betancourt did nothing to intervene and allowed the inmates assaulting Plaintiff to flee the cell.

2  (*Id.* ¶ 3.) Plaintiff asserts that he sustained documented physical injuries to his body as a result

3  of the attack. (Doc. # 96 at 11, citing Ex. A, Unusual Occurrence Chart of Assault; Ex. B,

4  photographs of injuries.)

5      Following the alleged battery incident described above, Plaintiff went back into his cell

6  to clean up the blood and saw that the inmates were about to return to Plaintiff's cell. (Doc. #

7  96 at 3 ¶ 4) Plaintiff ran out of his cell, threw a punch at an inmate but missed, and at that

8  point defendant Betancourt took control of the situation. (*Id.*, citing Ex. C, Defs.' Response to

9  Pl.'s Request for Prod. of Docs. at NDOC 0054.)

10     Plaintiff maintains that defendant Betancourt's failure to intervene constitutes

11  deliberate indifference to a serious risk to his safety. (Doc. # 96 at 10-11.)

12                    **b. Excessive Force-Defendants Preston and Robinson**

13     Plaintiff claims he then walked back into his cell. (Doc. # 96 at 3 ¶ 6.) Shortly thereafter,

14  defendants Preston, Robinson, and Peabody arrived and placed Plaintiff's hands in handcuffs

15  behind his back and removed Plaintiff from the cell. (*Id.*, citing Ex. E, Robinson's Response to

16  Interrogatory 7 at 3:10-13.) Seconds after he was removed from his cell, Plaintiff was ordered

17  once to get on the floor. (*Id.* at 4 ¶ 8.) Plaintiff claims his right knee was injured and

18  Defendants did not give him an honest chance to comply with the order before he was slammed

19  to the ground. (*Id.* ¶¶ 8-9, citing Ex. A; Ex. W, Preston's Response to Request for Admission

20  3, Set 2; Ex. D at 7:6-7; Ex. F, Robinson's Response to Request for Admission 3, Set 2; Ex. G,

21  Defs.' Response to Request for Production at NDOC 0004-0005 (officer reports).)

22     Plaintiff declares the use of force while he was handcuffed and injured was excessive.

23  (Doc. # 96 at 8 ¶ 2, Doc. # 96 at 11-13.) He contends that the weight of the two defendants on

24  his back "knock[ed] air from Plaintiff's body." (Doc. # 96 at 11.)

25             **c. Excessive Force-Defendants Payne, Preston, Robinson, Kelly,**

26  **Peabody, Moore, Taylor**

27     Plaintiff was then placed in leg cuffs and marched into the unit office. (Doc. # 96 at 4

28                                              9

¶ 10.) Offices Payne, Preston and Robinson took Plaintiff to medical to have his injuries documented, where the restraints were removed and he had to strip down to his boxers to be inspected. (*Id.* ¶ 11, citing Ex. A.) After this, the hand restraints were reapplied (he implies leg restraints were not reapplied because of the injury to his right knee). (*Id.* ¶ 12.) Defendants Payne, Preston, and Robinson then took Plaintiff to the visiting holding cell. (*Id.* ¶ 13.)

Shortly thereafter, Plaintiff was removed from the visiting holding room to the day room area where he was stripped down again so that photographs could be taken of his injuries. (*Id.* ¶ 14.) During this time, a taser was pointed at him. (*Id.*, citing Ex. E, Robinson's Response to Interrogatories at 3:15-18; Ex. X, Preston's Response to Request for Admission 6, Set 1.) Plaintiff maintains that he was not combative. (*Id.* at 4 ¶ 14, 5 ¶ 15, citing Ex. H, Payne's Response to Interrogatories at 3:18-22; Ex. I, Moore's Response to Interrogatory 3 at 8:13-17; Ex. B.) The other defendants, Kelly, Peabody, Moore, and Taylor all stood around in the day room area observing that there was no problem. (*Id.* at 5 ¶ 16, citing Ex. B.)

Plaintiff was then ordered to get dressed, was re-cuffed and placed back in the visiting holding cell. (*Id.* ¶ 17.)

Plaintiff asserts that the officers entered the lieutenant's office which was located in front of the visiting holding room, and Plaintiff saw defendant Peabody ripping up charts and trashing them. (Doc. # 65 at 8 ¶ 12.) Defendant Robinson looked up and saw Plaintiff watching and jumped up and said, "taser his ass," and defendants Kelly and Peabody rushed out of the office into the next room while defendant Robinson rushed past them into the visiting hallway. (Doc. # 96 at 5 ¶ 20.) Defendant Robinson then opened the door to the visiting holding cell, still yelling "taser his ass!" (*Id.* ¶ 21, citing Ex. J, Robinson's Response to Request for Admission 2, Set 2; Ex. G, Kelly's Officer's Report at NDOC 0002-0003, Robinson's Officer's Report and NDOC 0004-0005, Preston's Officer's Report at NDOC 0005-0006, and Payne's Officer's Report and NDOC 0008-0010.)

While Robinson was still yelling, he pulled Plaintiff from the seat and instructed defendant Payne to taser him. (*Id.* at 5 ¶ 22, citing Ex. L, Peabody's Response to Request for

Admission 2; Ex. M, Peabody's response to Interrogatories at 4:1-7; Ex. N, Payne's Response to Interrogatories at 3:18-28; 6 ¶ 23, citing Ex. E, Robinson's Response to Interrogatories at 3:19-21; Ex. D at 8:13-17, 9:18-20; Ex. G, Officers' Reports.)

According to Plaintiff, at no time did he attempt to kick at the officers. (Doc. # 96 at 6 ¶ 25.) Instead, he claims he was surrounded by officers and his hands were cuffed behind his back. (*Id*.)

Defendant Robinson then grabbed Plaintiff by the left hand and arm with force causing him pain, and resulted in a spiral break to Plaintiff's left hand as well as shoulder damage. (*Id*. ¶ 26, citing Ex. S.)

Plaintiff claims that he was then slammed into the wall in the back of the hallway, and then into the floor, face-first, near the locker. (*Id*. ¶ 27, citing Ex. D at 8:13-17, 9:18-20.)

Defendant Robinson then put his body to the right of Plaintiff's and instructed defendant Payne to taser him, and defendant Payne proceeded to shoot Plaintiff with the taser gun. (*Id*. ¶ 28, citing Ex. G.) Plaintiff maintains that at this time, he was restrained by defendant Robinson and cuffed, so that he was not posing any danger to himself or anyone else. (*Id*. ¶ 29.)

Defendant Preston was standing to the right of defendant Payne when this occurred. (*Id*. ¶ 30.) Defendants Moore and Taylor were "keeping point" for defendants Kelly and Peabody who were in the day room area. (*Id*., citing Ex. W, Preston's Response to Request for Admission 4.)

Defendant Preston came and grabbed Plaintiff's arms while defendant Robinson grabbed Plaintiff's legs, and dragged Plaintiff out of the visiting hallway, over 20 feet into the day room area where defendants Peabody and Kelly were standing. (*Id*. ¶ 31, citing Ex. D and Ex. W.)

Plaintiff contends that his version of events is supported by defendant Greene's response to his interrogatories because she admits to treating two inmates as a result of staff use of hands on force. (Doc. # 96 at 3, citing Ex. Y.)

Plaintiff also points out that in his responses to discovery, defendant Taylor contends he was not part of the events that took place on March 6, 2011, and was not at work; however, Plaintiff maintains that a photograph taken of Plaintiff's injuries in the day room that day reflects that defendant Taylor was indeed present. (Doc. # 96 at 4, citing Ex. B, Defs.' Response to Request for Prod. of Docs. at NDOC 0019; Ex. K.)[2]

Plaintiff argues that defendants Robinson and Payne used excessive force when defendant Robinson removed Plaintiff from the visiting holding cell and slammed Plaintiff into the wall and ground, and when defendant Payne shot Plaintiff with the taser, all while he was restrained and handcuffed, and not resisting. (Doc. # 96 at 8 ¶ 3.) He further contends that defendants Robinson and Preston used excessive force when they dragged Plaintiff over twenty feet down the hallway by his arms and legs while Plaintiff was still handcuffed behind his back. (*Id*. ¶ 4.) Plaintiff asserts that he did not resist or attempt to kick the officers, and he could not have reasonably been perceived as a threat when he was restrained with his hands behind his back. (*Id*. at 17-18.) He asserts that the remaining defendants, Kelly, Peabody, Moore, Taylor**,** and Preston (for the portion he was not actually involved in) stood by and did nothing while these events transpired. (*Id*. at 10.)

### 4. Defendants' Version of Events and Position

#### a. Failure to Protect-Defendant Betancourt

On March 6, 2011, defendant Betancourt contends he was working at WSCC as Unit 4B's "rover" and his duties included, but were not limited to: food service, escort of inmates within the institution, passing out mail, picking up inmate requests, securing inmates, and providing for the safety and security of staff and inmates. (Doc. # 105 at 3; Betancourt Decl., Doc. # 105-1 at 3 ¶ 7.)

Correctional Officers Roam and Yates were also working in the unit. (Doc. # 105 at 3; Roam Decl., Doc. # 105-2 at 2 ¶ 5.)

---

[2]Defendant Taylor does not argue in any of the briefing associated with these dispositive motions that he is entitled to summary judgment on this basis.

At approximately 5:19, defendant Betancourt and Officers Roam and Yates were in the Unit 4B control Bubble when they observed a fight between two inmates later identified as Plaintiff and inmate Franks. (*Id.*; Betancourt Decl., Doc. # 105-1 at 3 ¶ 9; Roam Decl., Doc. # 105-2 at 2 ¶ 6 .) Office Roam saw Plaintiff throw a punch at the other inmate, which did not connect. (Roam Decl., Doc. # 105-2 at 2-3 ¶¶ 6-7.) Betancourt contends that he reacted by yelling at the inmates to get on the floor, grabbed a shotgun, chambered a "popped round" (blank round used to get attention and compliance) and posted at the window. (Betancourt Decl., Doc. # 105-1 at 3 ¶ 10.) When the inmates heard the popped round, they complied and got to the ground. (Betancourt Decl., Doc. # 105-1 at 3 ¶ 11; Roam Decl., Doc. # 105-2 at 3 ¶¶ 9-10 (Officer Roam says this was true, for the most part).) Officer Roam got on the intercom and ordered the inmates to stay on the ground, and Officer Yates notified Search and Escort of the situation. (Roam Decl., Doc. # 105-2 at 3 ¶ 9.) Officer Roam estimates that the amount of time that elapsed from the moment he saw Plaintiff throw the punch and the time the inmates were ordered down to the ground was approximately five to ten seconds. (Roam Decl., Doc. # 105-2 at 3 ¶ 14.) Then Betancourt, Roam and Yates assisted in identifying the inmates involved in the fight. (Betancourt Decl., Doc. # 105-1 at 4 ¶ 14; Roam Decl., Doc. # 105-2 at 3 ¶ 11.)

Defendant Betancourt indicates he was not aware that Plaintiff had any enemies/separatees or other problems with inmates in Unit 4B. (*Id.*; Betancourt Decl., Doc. # 105-1 at 2 ¶ 5.) Neither he nor Officer Roam had previously observed Plaintiff in a fight. (Betancourt Decl., Doc. # 105-1 at 3 ¶ 12; Roam Decl., Doc. # 105-2 at 3 ¶ 8.)

Defendant Betancourt argues that Plaintiff's allegation that Betancourt saw the fight (so that he could have reacted) is unsubstantiated. (Doc. # 105 at 11.) Instead, Betancourt maintains that he did not see the fight, until the point when Plaintiff was throwing the punch, and at that time, he and his fellow officers reacted and took control of the situation. (*Id.*) Moreover, Betancourt declares that he had no prior knowledge that Plaintiff was having issues with any other inmate prior to this incident. (*Id.*)

13

**b. Excessive Force-Defendants  Preston and Robinson**

After the incident described above, correctional staff, including defendants Peabody, Preston, Robinson and Moore, arrived to Unit 4B. (Doc. # 105 at 3; Roam Decl., Doc. # 105-2 at 2 ¶ 11; Peabody Decl., Doc. # 105-3 at 3 ¶ 10; Robinson Decl., Doc. # 105-5 at 2 ¶¶ 6-7.)

Plaintiff had been identified as being involved in the fight, but was back in his cell. (Doc. # 105 at 3; Peabody Decl., Doc. # 105-3 at 3 ¶¶ 11-12.) Defendant Peabody went to Plaintiff's cell and observed him pacing back and forth, and affirmed that he had been involved in the fight. (Doc. # 105 at 3-4, Peabody Decl., Doc. # 105-3 at 3 ¶ 12.) As a result, Defendant Peabody ordered correctional officers to the cell to remove Plaintiff. (Doc. # 105 at 4; Peabody Decl., Doc. # 105-3 at 3 ¶ 12; Preston Decl., Doc. # 105-4 at 2 ¶ 8; Robinson Decl., Doc. # 105-5 at 3 ¶ 9.)

Defendant Peabody then went to the south tier main entrance to help separate inmates in terms of those who were involved and those who were not. (Peabody Decl., Doc. # 105-3 at 4 ¶ 13.) After he was done in Unit 4B, he reported back to Unit 1, where the sergeants' and lieutenants' offices are located, and updated defendant Kelly on the incident and began completing his paperwork regarding the incident. (Peabody Decl., Doc. # 105-3 at 4 ¶ 16.)

In the meantime, Plaintiff submitted to wrist restraints and was removed from his cell by defendants Preston and Robinson. (Doc. # 105 at 4; Preston Decl., Doc. # 105-4 at 3 ¶ 9; Robinson Decl., Doc. # 105-5 at 3 ¶ 10.)  They contend that they backed Plaintiff out of his cell, and ordered him to get to the ground, but he refused. (Doc. # 105 at 4; Preston Decl., Doc. # 105-4 at 3 ¶¶ 9-10; Robinson Decl., Doc. # 105-5 at 3 ¶¶ 10-11.) They state he was given two more orders to get to the ground, but still refused. (Doc. # 105 at 4; Preston Decl., Doc. # 105-4 at 3 ¶ 10; Robinson Decl., Doc. # 105-5 at 3 ¶ 11.) Defendant Preston pulled Plaintiff's arms so that his body went toward the ground, defendant Robinson stepped in front of Plaintiff's left leg and placed pressure on his right shoulder, Plaintiff went to a kneeling position, and both officers placed him to the ground on his stomach. (Doc. # 105 at 4; Preston Decl., Doc. # 105-4 at 3 ¶ 10; Robinson Decl., Doc. # 105-5 at 3 ¶ 11.) They did not resort to sweeping his legs from

14

under him. (Preston Decl., Doc. # 105-4 at 3 ¶ 10.) They then escorted him to medical to be evaluated for injuries from the fight. (Doc. # 105 at 4, Preston Decl., Doc. # 105-4 at 3 ¶¶ 13-14; Robinson Decl., Doc. # 105-5 at 3 ¶ 12.)

First, Defendants argue that when Plaintiff was first examined by medical after the fight, it was noted that his injuries were the result of the fight, and Plaintiff did not relay that he may have sustained any injuries as a result of defendants Preston and Robinson taking him to the ground. (Doc. # 105 at 12.) They contend that it appears his most serious injury, a broken finger, resulted from the fight. (*Id.*)

Second, Defendants claim that the force employed was reasonable under the circumstances. (Doc. # 105 at 12; Preston Decl., Doc. # 105-4 at 4 ¶ 21; Robinson Decl., Doc. # 105-5 at 5 ¶¶ 27-28.) After the fight occurred, the unit was placed on lockdown and staff were trying to figure out which inmates were involved. (*Id.*) Plaintiff was removed from his cell and ordered several times to get to the ground, but he refused. (*Id.*) Preston and Robinson then went "hands on" to gain Plaintiff's compliance and took him to the ground. (*Id.*) They advocate that it is not apparent Plaintiff sustained any injuries as a result of the use of force. (*Id.*)

**c. Excessive Force-Defendants Payne, Preston, Robinson, Kelly, Peabody, Moore, Taylor**

After Plaintiff was examined by medical related to injuries sustained in the fight, he was escorted to Unit 1 operations where he was placed in a non-contact room before photographs were taken. (Doc. # 105 at 4; Preston Decl., Doc. # 105-4 at 3 ¶ 14; Robinson Decl., Doc. # 105-5 at 3 ¶ 12; Payne Decl., Doc. # 105-7 at 3 ¶ 11.) The non-contact room was across from defendant Peabody's office. (Peabody Decl., Doc. # 105-3 at 4 ¶ 17.) Defendant Peabody was working on his reports when Plaintiff was placed in the non-contact room. (*Id.*) Between 6:30 and 7:00 p.m., Plaintiff was removed from the non-contact room by Search and Escort officers and defendant Kelly, questioned and photographs were taken. (Peabody Decl., Doc. # 105-3 at 4 ¶ 18; Preston Decl., Doc. # 105-4 at 3 ¶ 14; Robinson Decl., Doc. # 105-5 at 3 ¶ 13; Payne Decl., Doc. # 105-7 at 3 ¶ 14.) Defendant Peabody observed some of this activity as he would

15

1   occasionally look up from working on his reports. (*Id.*)

2   After the photographs were taken of Plaintiff's injuries, he was escorted back to the non-

3   contact room and instructions were given that Plaintiff was to be escorted back to Unit 4B and

4   placed in segregation by defendants Preston, Robinson, Moore and Payne. (Doc. # 105 at 4;

5   Peabody Decl., Doc. # 105-3 at 4 ¶ 19; Preston Decl., Doc. # 105-4 at 3 ¶¶ 15-16; Payne Decl.,

6   Doc. # 105-7 at 3 ¶ 15.)

7   Defendant Payne was certified in the use of a taser and was holding the taser in case

8   Plaintiff caused any problems. (Doc. # 105 at 4; Payne Decl., Doc. # 105-6 at 2 ¶¶ 2-3.)

9   Defendants Preston and Robinson were backing Plaintiff out of the non-contact room

10   when Plaintiff turned and attempted to kick defendant Preston (his legs were unrestrained).

11   (Doc. # 105 at 4; Doc. # 105-4 at 3 ¶ 16; Robinson Decl., Doc. # 105-5 at 3 ¶ 14; Payne Decl.,

12   Doc. # 105-7 at 3-4 ¶¶ 15-16.) Defendant Preston then used hands on force to place Plaintiff to

13   the ground along with defendant Robinson. (Preston Decl., Doc. # 105-4 at 4 ¶ 17.) Defendant

14   Robinson pulled Plaintiff to the ground and applied his body weight to Plaintiff's upper body

15   in an attempt to gain control over him. (Robinson Decl., Doc. # 105-5 at 3 ¶ 15.) Plaintiff

16   continued to resist and kick while he was on the ground. (Preston Decl., Doc. # 105-4 at 4 ¶ 17;

17   Robinson Decl., Doc. # 105-5 at 3 ¶¶ 15-16.)

18   As Plaintiff continued to struggle, defendant Payne gave the verbal command, "Taser,

19   Taser, Taser," which is protocol, to give Plaintiff one final opportunity to cease resisting. (Doc.

20   # 105 at 5; Preston Decl., Doc. # 105-4 at 4 ¶ 18; Robinson Decl., Doc. # 105-5 at 3-4 ¶ 16;

21   Payne Decl., Doc. # 105-7 at 4 ¶ 17.) Plaintiff, however, continued to resist, and defendant

22   Payne deployed the taser in order to protect Preston and Robinson and regain control. (Doc.

23   # 105 at 5; Preston Decl., Doc. # 105-4 at 4 ¶ 18; Robinson Decl., Doc. # 105-5 at 4 ¶ 16; Payne

24   Decl., Doc. # 105-7 at 4 ¶ 18.) One taser probe made contact with Plaintiff, and the other

25   missed, so Plaintiff did not receive the electrical charge the taser was meant to deliver. (Doc.

26   # 105 at 5; Preston Decl., Doc. # 105-4 at 4 ¶ 18; Robinson Decl., Doc. # 105-5 at 4 ¶ 17; Payne

27   Decl., Doc. # 105-7 at 4 ¶ 19.) Plaintiff was then taken to the ground by Preston and Robinson,

28

and Officer Giurlani assisted in placing him in leg restraints. (Doc. # 105 at 5; Preston Decl., Doc. # 105-4 at 4 ¶ 19.)[3]

Defendant Peabody recalls the door opening and the officers removing Plaintiff from the room when he heard a loud "bang" on the wall of the office, and when he looked up from his reports, he observed the officers struggling with Plaintiff, and telling him to stop struggling and stop kicking. (Peabody Decl., Doc. # 105-3 at 4 ¶ 20.) Defendant Peabody jumped up to assist the officers, and got to the door at the same time as defendant Kelly, and at that point he heard the taser being deployed. (*Id.* ¶ 21.) When he got into the hallway, he observed Plaintiff on the ground, with defendants Robinson and Preston holding him on the ground, and defendant Payne was in the doorway of the hallway with the taser in his hand. (*Id.* at 5 ¶ 33.) He recalls Plaintiff yelling at the officers. (*Id.* ¶ 34.)

Defendant Betancourt relates that around 7:08 p.m., he was advised by control that a taser had been deployed in Unit 1; and upon arrive, he saw Plaintiff was on the ground in restraints, with Officers Robins, Preston, Moore and Payne present. (Betancourt Decl., Doc. # 105-1 at 4 ¶ 17.) He claims to have observed Plaintiff as being verbally aggressive and argumentative with the officers. (*Id.* ¶ 18.)

Medical was called to evaluate Plaintiff and remove the taser probe. (Doc. # 105 at 5; Preston Decl., Doc. # 105-4 at 4 ¶ 20.) Plaintiff was then escorted to Unit 4B. (Doc. # 105 at 5; Preston Decl., Doc. # 105-4 at 4 ¶ 20.) H was subsequently taken to NNCC's Mental Health Unit. (Doc. # 105 at 5; Preston Decl., Doc. # 105-4 at 4 ¶ 20.)

Defendants state that Plaintiff was issued a notice of charges for his conduct, had a disciplinary hearing, and was found guilty of disobedience, assault, fighting and property

---

[3]Defendants' brief states Plaintiff was taken to the ground by defendants Preston and Robinson and Officer Giurlani. Defendant Preston's declaration states it is his recollection that Plaintiff was subdued by defendant Robinson and Officer Guirlani. (Preston Decl., Doc. # 105-4 at 4 ¶ 19.) Defendant Robinson's declaration does not state that he subdued Plaintiff after the taser event, instead he simply states that Plaintiff "was carried out of the hallway to the day room where he was placed in leg restraints and he was seen by medical." (Robinson Decl., Doc. # 105-5 at 4 ¶ 18.) Defendant Payne states that Plaintiff was taken to the ground and leg restraints were applied, but does not say by whom. (Payne Decl., Doc. # 105-7 at 4 ¶ 20.)

1    damage. (Doc. # 105 at 5.)

2         Defendants point to NDOC Operational Procedure (OP) 405, "Use of Force," which

3    states that force may be used "to protect one's self or others from harm, to compel compliance

4    with orders, to prevent the destruction of state or municipal property, to prevent or quell a

5    disturbance, and to prevent inmate escape." (Doc. # 105 at 5.)[4] Ex. G, Doc. # 105-7 at NDOC

6    0075." The NDOC "force continuum" in existence at the time included the following: (1) officer

7    presence; (2) verbal commands; (3) control and restraints; (4) chemical agents; (5) temporary

8    incapacitation (includes kinetic and impact devices); and (6) deadly force. (Doc. # 105 at 6,

9    citing Ex. G at NDOC 0075.) However, this is not a "step approach" as to the amount of force

10   to be employed, as this determination is made by the officer present on the scene. (*Id*.)

11        In addition, NDOC Administrative Regulation (AR) 405 provides for the use of a taser

12   to compel an inmate to comply with direct orders. (Doc. # 105, citing Ex. H at NDOC 0085-

13   0089.)

14        Defendant Payne argues that his use of the taser was a reasonable use of force under the

15   circumstances, where Plaintiff had attempted to kick officers as they were trying to escort him

16   back to the unit. (Doc. # 105 at 12.) Plaintiff was given a chance to stop resisting or struggling,

17   but failed to comply. (*Id*. at 13.) Thus, force was used to gain compliance and prevent injury to

18   the officers. (*Id*.; Preston Decl., Doc. # 105-4 at 4 ¶ 22; Robinson Decl., Doc. # 105-5 at 5 ¶¶ 27-

19   28.) Only one of the probes hit Plaintiff, and he was not incapacitated by electric shock,

20   although he did receive a small puncture wound to the hip. (Doc. # 105 at 13.) Payne maintains

21   that his intent was to protect the other officers and gain Plaintiff's compliance. (*Id*.; Payne

22

23        [4]While Defendants' reference document NDOC 0075, that they cite as being contained within Ex. G, and

24   while Ex. G, Attachment 3 contains OP 507, it does not contain page NDOC 0075, instead ending at NDOC 0074.
     (*See* Ex. G, Attachment 3, Doc. # 105-7 at 16-18.) Moreover, the version of OP 507 produced by Defendants

25   concerns administrative segregation, and not the use of force, as they contend. (*See id*.) A review of Defendants'
     notice of filing documents under seal reflects that only NDOC 0082-0084, of Ex. G, were filed under seal. (Doc.

26   # 106.) Then, while the exhibits filed in support of Defendants motion indicate that Attachments 1, 4, and 5 were
     submitted under seal (Doc. # 105-7), only Attachment 5 to Ex. G was actually submitted under seal. (Doc. # 106-1.)

27   Ultimately, this does not impact the court's analysis because a genuine dispute exists as to material facts
     underlying the excessive force claims that preclude the entry of summary judgment in favor of either side.

28                                                          18

1   Decl., Doc. # 105-7 at 4 ¶¶ 22-23.)

2       After the taser event, Defendants argue that it took at least three officers to take Plaintiff

3   down to apply the leg restraints. (Doc. # 105 at 13.) The officers were subjected to possible

4   injury because they had to go to the ground with Plaintiff. (*Id*.) Once the restraints were

5   applied, medical was brought in to evaluate Plaintiff. (*Id*.) Defendants argue that the use of

6   force in taking Plaintiff to the ground was reasonable in view of the fact that the taser had not

7   incapacitated Plaintiff and they had to react quickly to avoid injury. (*Id*.)

8       **5. Analysis**

9       The parties' accounts of what happened on March 6, 2011, as to each aspect of Plaintiff's

10  Eighth Amendment failure to protect and excessive force claims, are dramatically different.

11  Plaintiff acknowledges the diverging viewpoints between the parties, yet contends he is still

12  entitled to summary judgment, and Defendants do the same. These varying views as to material

13  facts preclude the entry of summary judgment on any of these claims.

14      **a. Failure to Protect-Defendant Betancourt**

15      First, with respect to the failure to protect claim against defendant Betancourt, a genuine

16  dispute of material fact exists so as to preclude summary judgment from being granted in favor

17  of either party. Defendant Betancourt predicates his defense on: (1) the fact that he had no

18  knowledge Plaintiff had any issues with other inmates in his unit prior to this incident; (2) the

19  fact that he did not see the incident commence, as Plaintiff suggests, and instead only saw

20  Plaintiff throw a missed-punch, and at that point took appropriate steps to take control of the

21  situation.

22      Plaintiff disputes both of these points. Plaintiff contends that defendant Betancourt saw

23  the incident from the moment it spilled out onto the tier and did *nothing* to intervene until it

24  was too late—when Plaintiff had gone back to his cell to clean the blood out of his eyes and saw

25  the other inmates getting ready to come into his cell to attack him again. It was at that point

26  that Plaintiff asserts he ran back out of the cell and threw the missed-punch when defendant

27  Betancourt decided to intervene. Plaintiff's claim, unlike Betancourt's defense, is centered on

28                                                  19

1  Betancourt's failure to intervene when he saw Plaintiff being assaulted, not on whether he knew

2  of any prior problems Plaintiff might have had with inmates on the units.

3      As the court noted above, an Eighth Amendment claim can be predicated on a failure

4  to intervene. *See Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995). Because a genuine

5  dispute of material fact exists as to when Betancourt became aware of the fight involving

6  Plaintiff and the other inmates it cannot be determined whether or not Betancourt knew

7  Plaintiff faced a substantial risk to his safety at that time and therefore, whether his response

8  was reasonable or unreasonable.

9      Accordingly, the court recommends that both Plaintiff's and Defendants' motion for

10  summary judgment be denied as to this claim.

11                    **b. Excessive Force-Defendants Preston and Robinson**

12      The court also notes the existence of a genuine dispute as to material facts with respect

13  to this claim.

14      Defendants Preston and Robinson contend that they applied a reasonable amount of

15  force necessary to gain Plaintiff's compliance after he refused to get down to the ground. They

16  contend that they only applied the minimum amount of force that was needed to gain Plaintiff's

17  compliance.

18      Plaintiff, however, contends that in view of his injury, they did not give him a

19  meaningful chance to comply with their order, and then applied an unreasonable amount of

20  force to take Plaintiff to the ground given that he was restrained, and in his view, not resisting.

21  Plaintiff disputes there was any need to apply this amount of force, and that there is no

22  correlation between the need and the amount of force used given that he was handcuffed

23  behind his back and injured. He similarly contends that the officers could not have reasonably

24  perceived Plaintiff as a threat in this condition. He argues that under these circumstances, it

25  was excessive to slam him to the ground, face-first, from a standing position.

26      Defendants argue Plaintiff cannot establish he suffered any injury as a result of this

27  incident, but Plaintiff contends that the force used was excessive under the circumstances and

28                                          20

that it knocked the wind out of him. While perhaps not substantial, Plaintiff claims that he suffered some injury as a result of this incident. The Supreme Court has instructed: "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 130 S.Ct. at 1178-79. A fact-finder is tasked with resolving the factual dispute concerning Plaintiff's asserted injury, and if the fact-finder determines the injury is more than *de minimis*, but still "relatively modest," Plaintiff's damages will be appropriately limited. *See id.* at 1180.

In view of these differing versions of events, both Defendants' and Plaintiff's motions for summary judgment should be denied as to this claim.

### c. Excessive Force-Defendants Payne, Preston, Robinson, Kelly, Peabody, Moore, Taylor

The divergence of factual accounts between the parties continues into this excessive force claim.

First, Plaintiff contends that it was before the actual tasering even occurred that defendant Robinson grabbed Plaintiff's hand and arm with such force that it caused his left hand to break, and then slammed Plaintiff into the wall and then the ground.

Defendants, on the other hand, claim that while Preston and Robinson were backing Plaintiff out of the non-contact room, Plaintiff attempted to kick Preston, and hands on force was used to place Plaintiff on the ground and gain his compliance. Defendants state that Plaintiff continued to resist and kick while he was on the ground.

Defendants also claim that the break in Plaintiff's hand was caused by the fight which had occurred earlier in the day. Dr. Long's records, however, come to no conclusion as to the cause of the fight other than it occurred in close proximity to March 9, 2011, when the x-rays were taken. (Doc. # 106-2 at 25.)

Next, as to the taser event, Plaintiff argues this was a completely unjustified use of force. Plaintiff maintains that at no time did he attempt to kick any of the officers or otherwise resist. Rather, he claims that during this time period he was surrounded by officers with his hands

21

1  cuffed behind his back, and did not pose a danger to anyone.

2      Defendants have a differing version of events. They contend that the use of the taser
3  resulted from Plaintiff trying to kick defendant Preston, and then failing to follow several
4  commands to comply, and his continued resistance and kicking.

5      Defendant Payne's position is that he used the taser after giving Plaintiff a chance to
6  comply in order to protect Robinson and Preston and to regain control.

7      Defendants indicate that Plaintiff did not suffer from the electrical shock that the taser
8  was intended to deliver because the other probe failed to deploy correctly, but do not dispute
9  that he suffered a small puncture wound in his hip from the probe that was deployed. If
10  Defendants are insinuating that this establishes Plaintiff's injury was *de minimis*, this is
11  certainly a disputed fact, as Plaintiff undoubtedly takes the position that suffering a puncture
12  wound to the hip following the deployment of a taser probe is significant for purposes of the
13  excessive force analysis. *See Wilkins*, 130 S.Ct. at 1178-79.

14      Finally, Plaintiff claims that after the taser incident, defendants Preston and Robinson
15  dragged Plaintiff down the hallway over twenty feet.

16      Defendants argue that after the taser event, it took at least three officers to take Plaintiff
17  down to apply leg restraints, and that any forced used in doing so was reasonable because the
18  officers were subjected to possible injury when they had to go to the ground with Plaintiff. They
19  advocate that any force used was also reasonable in view of the fact that the taser had no
20  incapacitated Plaintiff and they had to react quickly to avoid injury. (*Id.*)

21      As to each of these three incidents where force was applied, the foregoing illustrates the
22  existence of a genuine dispute of material fact regarding the amount of force used, the extent
23  of injury, the need for the application of force, the correlation between the need for the use of
24  force and the amount of force used, and whether Plaintiff reasonably posed a threat to
25  Defendants, and ultimately whether the force was "applied in a good-faith effort to maintain
26  or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7;
27  *see also Whitley*, 475 U.S. at 320-21.

28

22

1    Therefore, both Defendants' and Plaintiffs' motions for summary judgment should be

2    denied as to this claim.

3    **B. Eighth Amendment Deliberate Indifference to Serious Medical Need-**

4    **Defendants Greene and Haynes**

5        **1. Legal Standard**

6        A prisoner can establish an Eighth Amendment violation arising from deficient medical

7    care if he can prove that prison officials were deliberately indifferent to a serious medical need.

8    *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "The requirement of deliberate indifference is less

9    stringent in cases involving a prisoner's medical needs than in other cases involving harm to

10   incarcerated individuals because '[t]he State's responsibility to provide inmates with medical

11   care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*,

12   974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104

13   F.3d. 1133 (9th Cir. 1997). "In deciding whether there has been deliberate indifference to an

14   inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors

15   or administrators." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

16       A finding of deliberate indifference involves the examination of two elements: "the

17   seriousness of the prisoner's medical need and the nature of the defendant's responses to that

18   need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir.

19   2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need

20   exists if the failure to treat a prisoner's condition could result in further significant injury or

21   the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*,

22   429 U.S. at 104); *Akhtar*, 698 F.3d at 1213 ("First, the plaintiff must show a serious medical

23   need by demonstrating that failure to treat a prisoner's condition could result in further

24   significant injury or the unnecessary and wanton infliction of pain."). Examples of conditions

25   that are "serious" in nature include "an injury that a reasonable doctor or patient would find

26   important and worthy of comment or treatment; the presence of a medical condition that

27   significantly affects an individual's daily activities; or the existence of chronic and substantial

28                                                    23

pain." *Id.* at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (quoting *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical needs are serious, Plaintiff must show that Defendants acted with deliberate indifference to those needs. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id.* Inadvertence, by itself, is insufficient to establish a cause of action under § 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong...is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511 U.S. at 858). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). In addition, it "may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006), *overruled on other grounds by WMX Techs, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc) (internal quotation marks omitted)). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

///

24

1

**2. Plaintiff's Version of Events and Position**

2
3
4

After Plaintiff was shot with the taser, he contends that defendants Greene and Haynes, the nurses on duty, were called and the taser dart was removed from Plaintiff's hip. (Doc. # 96 at 7 ¶ 34, citing Ex. R, Unusual Occurrence Chart from March 6, 2011 re: Pl.'s hip.)

5
6
7
8

Defendants Taylor, Payne, Moore, Preston and Robinson then walked Plaintiff to the administrative segregation unit 4-B. (*Id.* ¶ 35.) Shortly thereafter, Plaintiff claims he started to feel a burning sensation in his left hand and arm and requested medical treatment. (*Id.* ¶ 36, citing Ex. S, Unusual Occurrence Chart from March 6, 2011 re: Pl.'s left hand.)

9
10

Defendants Greene and Haynes came and checked out Plaintiff's hand, but provided no treatment. (*Id.* ¶ 37, citing Ex. T, Haynes' Response to Interrogatory 6.)

11
12
13

Plaintiff then asked to be moved to the mental health unit at Northern Nevada Correctional Center (NNCC). (*Id.* ¶ 38.) He disputes that he ever said that he "could not take any more" or that he would hurt himself. (*Id.*)

14
15
16
17

Plaintiff was eventually sent to NNCC, where he received pain medication, x-rays and medical treatment for his hand. (*Id.* ¶ 39, Ex. U, Unusual Occurrence Chart from March 14, 2011 re: Pl.'s hand; Ex. V, Carson Orthopedic Center Spinal Institute of Nevada forms dated March 29, 2011, March 30, 2011 and April 14, 2011.)

18

**3. Defendants' Version of Events and Position**

19
20
21
22
23
24
25

According to Defendants', medical was summoned by Plaintiff four times on March 6, 2011. (Doc. # 105 at 6, Clinkscales Decl., Doc. # 106-2 at 2-3 ¶ 7, citing NDOC 0001-0004 (set forth at Doc. # 106-2 at 5-8.) The first of these four visits related to the initial fight, where Plaintiff reported that he was jumped by fifteen inmates. (Doc. # 105 at 6; Doc. # 106-2 at 5.) The records note Plaintiff had abrasions, pain/swelling, hematoma and scratches. (*Id.*) Plaintiff also complained of painful range of motion in his left wrist. (*Id.*) He was advised to wash the abrasions with soap and water, and was told he would be assessed again the following day. (*Id.*)

26
27

The next medical visit occurred approximately one hour later, after Plaintiff had been tasered. (Doc. # 105 at 6; Doc. # 106-2 at 6.) At that time, it was noted Plaintiff received a small

28

25

puncture wound to his left hip, but he had not received an electric shock. (Doc. # 105 at 6-7; Doc. # 106-2 at 6.) The probe was removed and Plaintiff was advised to wash the wound with soap and water. (Doc. # 105 at 7; Doc. # 106-2 at 6.)

The third visit by medical occurred at approximately 8:15 p.m., when Plaintiff complained that he thought his left wrist was broken. (Doc. # 105 at 7; Doc. # 106-2 at 7.) It was noted there was no deformity or swelling. (*Id.*) Plaintiff was given pain medication and a follow-up examination was scheduled for the next day. (*Id.*)

The fourth and final visit by medical that day occurred at approximately 9:30 p.m., when Plaintiff expressed what Defendants describe as suicidal ideations. (Doc. # 105 at 7; Doc. # 106-2 at 8.)[5] Transport to NNCC's mental health unit was arranged that night. (*Id.*)

Plaintiff was subsequently seen several times regarding his hand by NDOC Staff and Dr. Richard Long of the Carson Orthopaedic Center. (Doc. # 105 at 7; Doc. # 106-2 at 11-12, 17-22.) He was diagnosed with a spiral fracture of the third metacarpal on March 10, 2011. (Doc. # 105 at 7; Doc. # 106-2 at 25.)  Dr. Long recommended a splint and additional x-rays. (Doc. # 105 at 7; Doc. # 106-2 at 26.) If a significant change in the fracture displacement occurred, he may have required surgery, but it was ultimately not necessary as the fracture healed. (Doc. # 105 at 7, Doc. # 106-2 at 25-26.)[6]

While Plaintiff complains that defendants Greene and Haynes failed to treat his hand injury in an acceptable manner, Defendants argue that Plaintiff's medical records establish that Plaintiff was examined four times by medical on March 6, 2011, and each time he was evaluated and was scheduled for follow-up care. (Doc. # 105 at 15.) While follow-up evaluation was scheduled for the following day, Plaintiff voiced suicidal ideations and he was transported to

---

[5]The record from this visit by medical describes Plaintiff's complaint as follows: "I can't take it anymore. I feel like I'm being set up. I'm going to kill myself." (Doc. # 106-2 at 8.) This is also reflected in the progress notes. (Doc. # 106-2 at 11.) Plaintiff disputes he made this statement.

[6]Dr. Long's records indicate that additional x-rays were ordered and Plaintiff continued to be evaluated. (Doc. # 106-2 at 25-29.) The last record from Dr. Long is dated April 20, 2011, and states that the fracture "remains in good position and alignment" and is noted to be "healing." (Doc. # 106-2 at 29.)

NNCC's Mental Health Unit, and he received care for his hand injuries. (*Id.*)

Plaintiff's reply to Defendants' motion for summary judgment does not address this claim. Plaintiff's opposition also lacks any substantive argument regarding this claim, other than to state in a conclusory fashion that a factual issue exists as to whether these defendants denied him medical care. (Doc. # 114 at 7 ¶ 13.)

### 4. Analysis

Defendants do not specifically present the argument that Plaintiff's hand injury did not constitute a serious medical need. Therefore, the court's analysis will focus on the response of Defendants Greene and Haynes.

It is undisputed that after the initial fight occurred, Plaintiff was seen by medical and complained of painful range of motion in his left wrist. He was evaluated, told to wash his other wounds with soap and water, and was scheduled for a follow-up examination the following day. (Doc. # 106-2 at 5.)

It is also undisputed that Plaintiff was then seen by medical regarding the taser event. (Doc. # 106-2 at 6.) At that time, no complaints were noted regarding Plaintiff's left hand. (*Id.*)

Plaintiff subsequently asked to be seen by medical and complained that he thought his left wrist was broken. (Doc. # 106-2 at .) It was noted that there was no deformity or swelling to the left wrist, no crepitus or open areas. (*Id.*) He was given pain medication and the plan was to reassess his condition the following day. (*Id.*)

Plaintiff was seen one last time that night by medical before he was transported to NNCC's Mental Health Unit. (Doc. # 106-2 at 8.) While Plaintiff disputes that he made the suicidal ideations attributed to him, he does not dispute that he was transferred to NNCC that night. (*Id.*)

Therefore, no follow up care took place, nor could it take place, at WSCC the following day.

After Plaintiff's arrival to NNCC, it is undisputed that he received medical care for his left hand, x-rays were taken, and  it was diagnosed as a spiral fracture of the third metacarpal

by Dr. Long on March 10, 2011. (Doc. # 106-2 at 25-26.) While Dr. Long said that the hand could ultimately require surgery if there was a significant change in the fracture displacement (Doc. # 106-2 at 26), it eventually healed and surgery was not necessary (*id*. at 29).

While it is undisputed that Plaintiff complained of pain in his left hand and that he thought it was broken, Defendants evaluated Plaintiff, noted that there was no swelling or deformation or bruising, gave him pain medication, and planned to re-evaluate his condition the following day. There does not appear to be any deliberate indifference in this course of conduct considering that there was no swelling or deformation noted in the hand. Plaintiff does not dispute that he was transported to NNCC that night, at his own request, and therefore, there was no opportunity for Defendants to provide any follow up care to Plaintiff the next day. Plaintiff received care for his hand once he arrived at NNCC and the fracture ultimately healed. Plaintiff has produced no evidence to dispute this fact, or to establish that he suffered any further injury as a result of Defendants' alleged delay in providing treatment.

There is no evidence Defendants knew of and disregarded a serious risk to Plaintiff's health when they evaluated Plaintiff, gave him pain medication and planned to reassess his condition the following day. Accordingly, summary judgment should be granted as to defendants Greene and Haynes.

**C. Fourteenth Amendment Due Process-Defendant Kelly**

Neither party addresses this claim in their dispositive motion. (*See* Docs. # 96, # 109.) When the Third Amended Complaint was filed, Defendants opted to answer it and did not move to dismiss any portion thereof. (Doc. # 62.) Therefore, the Fourteenth Amendment due process claim against defendant Kelly remains as part of the Third Amended Complaint.

Plaintiff predicates his Fourteenth Amendment due process claim against defendant Kelly on the fact that Kelly allegedly wrote up a false incident report and notice of charges to cover up these Eighth Amendment violations, stating that Plaintiff had assaulted the officers. (*Id*. at 9.) He contends there was no evidence to support the charges. (*Id*.)

While no party moved for summary judgment as to this claim, the court has the power

28

to review this claim, and recommend dismissal of a claim that is frivolous or malicious, fails to state a claim upon which relief may be granted or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B),28 U.S.C. § 1915A(a)-(b).

Courts have held that prisoners do not have a constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. *See Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989); *Freeman v. Rideout*, 808 F.2d 949, 951-52 (2d. Cir. 1986), *cert. denied*, 485 U.S. 982 (1988) (allegation that false evidence was planted by a prison guard does not state a constitutional claim where procedural process protections are provided); *see also York v. Hernandez*, 2011 WL2650243, at * n. 3 (N.D. Cal. 2011) (where plaintiff alleged violation of due process rights by filing false charges against him, court stated, "without more, a prisoner has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."); *Tafilele v. Harrington*, 2011 WL2462750, at *7 (E.D. Cal. 2011). Rather, the Fourteenth Amendment provides that a prisoner has a right not to be deprived of a protected liberty interest without due process of law. *Sprouse*, 870 F.2d at 452. Thus, as long as a prisoner receives proper procedural due process, a claim based on the falsity of disciplinary charges, standing alone, does not state a constitutional claim. *Id.*; *see also Freeman*, 808 F.2d at 951; *Hanrahan v. Lane*, 747 F.2d 1137, 1140-41 (7th Cir. 1984).

To the extent Plaintiff's claim is predicated on an allegation that he was falsely accused, the claim should be dismissed. However, Plaintiff's claim should proceed insofar as he alleges that the disciplinary charges brought against him were not supported by "some evidence." *See Superintendent Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985); *see also Wapole v. Hill*, 472 U.S. 445, 454-55 (1984) (citations omitted); *Bruce v. Ylst*, 351 F.3d 1283, 1287-88 (9th Cir. 2003).

### D. Official Capacity Damages

"[F]ederal courts are barred by the Eleventh Amendment from awarding damages against state officials acting in their official capacities[.]" *Snow v. McDaniel*, 681 F.3d 978, 991

(9th Cir. 2012) (citing *Bank of Lake Tahoe v. Bank of Am.*, 318 F.3d 914, 918 (9th Cir. 2003)).

Accordingly, it should be ordered that Plaintiff's claim for damages against any defendant in his or her official capacity be dismissed.

### IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order that Plaintiff's motion for summary judgment (Doc. # 96) be **DENIED**, and that Defendants' motion for summary judgment (Doc. # 109) be **GRANTED IN PART AND DENIED IN PART** as follows:

(1) The motion should be **DENIED** as to the Eighth Amendment excessive force and failure to protect claims against defendants Betancourt, Preston, Robinson, Payne, Kelly, Peabody, Moore and Taylor; and

(2) It should be **GRANTED** as to the Eighth Amendment deliberate indifference to serious medical need claim against defendants Greene and Haynes.

**IT IS HEREBY FURTHER RECOMMENDED** that:

(1) Plaintiff's Fourteenth Amendment due process claim against defendant Kelly should be **DISMISSED** to the extent it alleges that Plaintiff was falsely accused of conduct which led to disciplinary charges against him, but should **PROCEED** insofar as he alleges that his disciplinary action was not based on some evidence; and

(2) Plaintiff's claims for damages against any defendant in his or her official capacity should be **DISMISSED**.

The parties should be aware of the following:

1.     That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.     That this Report and Recommendation is not an appealable order and that any

notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the

District Court's judgment.

**DATED: January 27, 2014.**

_____
**WILLIAM G.  COBB**
**UNITED STATES MAGISTRATE JUDGE**

31